IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| KRYSTLE JONES,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | CASE NO. 1:25-CV-02729-SO<br><br>JUDGE SOLOMON OLIVER, JR.<br><br>MAGISTRATE JUDGE DARRELL A. CLAY<br><br>**REPORT AND RECOMMENDATION** |

## INTRODUCTION

Plaintiff Krystle Jones challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter was referred to me under Local Civil Rule 72.2 to prepare a Report and Recommendation. (Non-document entry of Dec. 16, 2025). For the reasons below, I recommend the District Court **REVERSE** the Commissioner's decision and **REMAND** for proceedings consistent with this Report and Recommendation.

## PROCEDURAL BACKGROUND

Ms. Jones applied for DIB on June 17, 2024, alleging disability beginning June 14, 2024. (Tr. 186). After her claim was denied initially and on reconsideration, Ms. Jones requested a hearing before an Administrative Law Judge. (Tr. 68, 75, 83, 110). On June 10, 2025, Ms. Jones (represented by counsel) and a vocational expert (VE) testified before the ALJ. (Tr. 47-67). On July 16, 2025, the ALJ determined Ms. Jones was not disabled. (Tr. 10-27). On October 17, 2025, the Appeals Council denied Ms. Jones' request for review of the ALJ's decision, making the ALJ's

decision the final decision of the Commissioner. (Tr. 1-3; *see also* 20 C.F.R. § 404.981). Ms. Jones timely filed this action. (ECF #1).

## Factual Background

### I. Personal and Vocational Evidence

Ms. Jones was 36 years old on the alleged onset date and 37 years old at the administrative hearing. (*See* Tr. 76). She holds a college degree and has worked as a corrections officer, IT specialist, logistics specialist, order selector, and package handler. (Tr. 226, 61).

### II. Relevant Medical Evidence

Ms. Jones served in the United States Marine Corps from 2006 to 2014. (*See* Tr. 1024). She receives health services, including mental health services, through the Veterans Affairs (VA) Northeast Ohio Healthcare System. (*See* Tr. 401). Although the earliest available medical records date back to July 2022, Ms. Jones was diagnosed with bipolar disorder in 2021 and was hospitalized on 10 occasions for psychiatric episodes between July 2021 and July 2022. (*See* Tr. 1031). In October 2021, a VA mental health treatment coordinator (MHTC) was assigned to Ms. Jones. (*See* Tr. 2785). On July 1, 2022, the VA assigned Ms. Jones' psychiatrist Anna-Lynn Reyes, M.D., as a MHTC due to the complexity of her condition involving serious mental impairment, substance use disorder, and nonadherence to prescribed treatment leading to multiple hospitalizations. (Tr. 3365-66). Ms. Jones was also enrolled in the Parma VA Clinic's Mental Health Intensive Case Management (MHICM) program with registered nurse Bridgette Bright. (*See* Tr. 2023, 3013, 3368).

**2022.** In June, Ms. Jones reported she had not resumed her oral medications (Depakote and lithium) but received her monthly dose of Abilify, a long-acting injectable (LAI). (Tr. 3366).

She reported both forms of medication caused her to feel more depressed and less motivated. (Tr. 3365-66). Dr. Reyes encouraged her to resume her medications, or "at least" the lithium, and discussed "the pitfalls of cannabis use" in the context of her mental illness. (Tr. 3367).

Ms. Jones was hospitalized again in August after Dr. Reyes noted she missed her appointment to receive her monthly LAI and was agitated when she presented for her psychiatric appointment. (*See* Tr. 1030). On admission, Ms. Jones claimed she did not attend her appointment to receive the LAI because she did not like needles and it hurt to sit after receiving the injection. (Tr. 1031). She presented with acute mania, pressured speech, and disorganized thoughts and behaviors. (Tr. 1032). She admitted to daily cannabis use and nonadherence to her antipsychotic medications for several weeks. (*Id.*). Cannabis use was confirmed in a positive drug screen. (Tr. 3168). Over the course of nine days, Ms. Jones repeatedly declined Depakote or lithium to improve her manic symptoms because they made her feel more depressed but agreed to receive the LAI. (Tr. 1031, 1033, 3263). Her symptoms improved during her stay, and she was discharged on August 25, 2022. (Tr. 1033). The inpatient provider counseled Ms. Jones to abstain from cannabis use because in those with bipolar disorder marijuana is known to worsen mood stability. (*Id.*).

In early October, Ms. Jones expressed her belief that she does not have bipolar disorder and attributed her psychotic symptoms to cannabis use. (Tr. 3090). Later that month, Ms. Jones tried to fight her Uber driver and was taken to the hospital due to her erratic behavior. (*See* Tr. 1022). Ms. Jones was then transferred to a VA hospital psychiatric unit on October 21 for stabilization. (*Id.*). On admission, Ms. Jones reported medication compliance and good sleep, noting she can usually tell when she is having a manic episode because she spends more money

and sleeps poorly. (*Id.*). She then reported she quit her job two weeks ago, had no plans for future employment, was considering school, and hoped for an early discharge so she could pick up a puppy she recently purchased. (*Id.*). Mental status examination showed unwavering eye contact, calm and engaged behavior, blunted and stable affect with constricted range and intensity, concrete and organized thought process, and limited insight and judgment. (Tr. 1025). The treating provider prescribed quetiapine and restarted lithium, both for mood stabilization. (Tr. 1026). Initially, Ms. Jones was hyperactive, hyperverbal, irritable, easily agitated, had low frustration tolerance, and needed frequent redirection from the staff. (*Id.*). Ms. Jones became less irritable and labile when the provider increased quetiapine again. (*Id.*). The treating provider also switched her LAI from Abilify to paliperidone (Invega). (*Id.*). Ms. Jones received two doses before discharge. (*See* Tr. 2794). Ms. Jones was "firmly resistant" to entering a residential rehabilitation and treatment program or an addiction treatment program but agreed to quit using cannabis. (*Id.*). After significant improvement in symptoms, Ms. Jones was discharged on November 11, 2022. (*Id.*).

On November 15, Ms. Jones met with Dr. Reyes where she was uncooperative, appeared disinterested and disengaged, provided short answers, and was euthymic with a blunted affect. (Tr. 2795). Ms. Jones reported taking her medications and denied side effects. (Tr. 2794). She agreed to take her medications as prescribed and not use cannabis or alcohol to prevent mania and hospitalization. (*Id.*).

On November 16, Ms. Jones met with Nurse Bright to prepare a treatment plan. (Tr. 2785-86). Ms. Jones acknowledged her main problems are not taking her medications as prescribed and

using cannabis, so she set her treatment goals as taking her medication and not using drugs or alcohol. (Tr. 2787-88).

On November 22, Ms. Jones met with Dr. Reyes for another follow-up appointment and reported "doing okay" and "staying away from cannabis." (Tr. 2779). She was more cooperative that day and endorsed compliance with medication. (Tr. 2779-80).

**2023.** From December 2022 through April 2023, Ms. Jones received monthly paliperidone injections. (Tr. 2772, 2759, 2745-46, 2738, 2714, 2689) (chronological order). In March and April, Ms. Jones' drug screens were negative, and she reported being fired from her job due to low productivity. (Tr. 982, 2705).

On May 25, Dr. Reyes called Ms. Jones because she missed her appointment to receive her LAI. (Tr. 2663). Ms. Jones reported she cannot continue to receive monthly injections because of work and no way of getting to the appointment. (*Id.*). She also admitted not taking her oral medications for a few weeks but did not provide a reason. (*Id.*). Ms. Jones agreed to restart her oral medications after Dr. Reyes expressed concern that Ms. Jones would decompensate without them. (*Id.*). A few days later, Nurse Bright documented her suspicion that Ms. Jones was not being truthful when she reported resuming her medications. (Tr. 2661). In June, Ms. Jones reported interrupted sleep and admitted she had not restarted her medications because she does not need them. (Tr. 2657).

In mid-July, Ms. Jones explained to Dr. Reyes that lithium slows her down. (Tr. 2643). After Dr. Reyes discussed that prolonged inadequate sleep could trigger decompensation, Ms. Jones agreed to start taking quetiapine, but not the other medications. (Tr. 2644). One week later, Ms. Jones was "slightly manic" during her meeting with Nurse Bright, smiling the entire

conversation and doing most of the talking, "which [was] not her norm." (Tr. 2642). Nurse Bright documented elevated and rapid speech, flight of ideas, and fair-to-poor insight and judgment. (Tr. 2641). At the end of the month, Ms. Jones reported increased depression and anxiety along with some improved sleep after restarting quetiapine a few days before. (Tr. 2636). Dr. Reyes noted Ms. Jones was cooperative and more engaged, anxious and depressed, and reactive "with some nervous laughter." (Tr. 2637). She told Ms. Jones to restart quetiapine and lithium. (*Id.*).

On August 1, Ms. Jones presented to an urgent psychiatric clinic for anxiety and difficulty falling asleep. (Tr. 2628). She admitted not restarting her medications because they make her feel slow and continued to decline her LAI because she cannot leave work to get a shot each month. (Tr. 2628-29). She endorsed racing thoughts and denied using alcohol or drugs. (Tr. 2629). The clinic provider noted Ms. Jones was distractible and anxious, spoke in monotone, and had a constricted affect. (Tr. 2630).

Between August and December, Ms. Jones met regularly with Dr. Reyes (monthly) and Nurse Bright (twice each week), during which she reported fluctuating sleep, depression, anxiety, suicidal thoughts, and not taking her medications as prescribed because they made her tired and more depressed. (*See, e.g.*, Tr. 2622, 2617, 2614, 2603, 2601, 2599, 2596, 2587, 2581, 2578, 2575, 2571, 2560-62, 2547, 2529, 2527, 2524, 2519, 2515, 2509, and 2504-06) (chronological order). Sometimes she presented as manic (Tr. 2531, 2605, 2620); at other times, she was dysthymic, constricted, and blunted (Tr. 2506, 2527, 2563, 2601, 2615). In October, Ms. Jones tested negative for cannabinoids. (Tr. 2572).

**2024.** On January 4, Ms. Jones admitted to Nurse Bright she had been lying about taking her medications for some time and that she does not take lithium and only takes quetiapine when

she cannot sleep. (Tr. 2492). Nurse Bright noted Ms. Jones spoke rapidly, was distracted and constricted, and had a disorganized thought process. (Tr. 2491).

On January 12, Ms. Jones reported to Dr. Reyes that she was not taking her medications due to side effects. (Tr. 2484). She also reported she would be starting a new job next week. (*Id.*). When Dr. Reyes reminded her that untreated bipolar disorder would lead to deterioration, Ms. Jones claimed her manic episodes were due to marijuana. (*Id.*).

Between February and April, Ms. Jones continued to meet with her mental health providers regularly but became more difficult to contact and was more irritable. (Tr. 2444, 2447-48, 2450, 2452, 2461). In April, Ms. Jones began working more hours for overtime pay. (Tr. 2437). Nurse Bright noted Ms. Jones showed little interest in any of her past hobbies outside of work. (Tr. 2435). By mid-April, Ms. Jones was working double shifts a few times a week. (Tr. 2427).

On May 8, during a psychiatry psychosocial assessment, Ms. Jones expressed her belief that she does not have bipolar disorder. (Tr. 2404). On May 30, Ms. Jones met with Nurse Bright and was distracted throughout the visit. (Tr. 2382). She mumbled at times, laughed at inappropriate moments, was delusional and quickly changed from one topic to another, and had poor judgment and insight, and slurred speech. (Tr. 2382-83).

On May 31, Nurse Bright and Dr. Reyes noted bizarre behavior, slurred speech, and giggling. (*See* Tr. 1015). A drug screen taken that day was preliminarily positive for cannabis. (Tr. 2296). The following day, Ms. Jones' sister took her for a psychiatric evaluation and explained that Ms. Jones had been working overtime for the past two to three months and had not been sleeping much. (Tr. 1015). Ms. Jones' sister noted some manic behavior in the days before this evaluation, including trying to take a loan out for $500,000, saying threatening things, and pacing the house,

and reported her suspicion that Ms. Jones had used cannabis recently. (*Id.*). She also indicated Ms. Jones had been off her medications for about a year. (*Id.*). During the initial interview, Ms. Jones was mildly labile and suspicious of the interviewer, laughed hysterically, used explicit and derogatory language, denied recent substance use, and attempted to leave the facility. (Tr. 1016). The interviewer documented antagonistic and uncooperative behavior, slurred and pressured speech, blunted affect, disorganized and bizarre thought process, distractible, and poor insight and judgment. (Tr. 1018). Ms. Jones continued to be labile, verbally aggressive, and suspicious of others for two days, requiring seclusion and Ativan for sedation. (Tr. 1019). With quetiapine and lithium, she slowly stabilized and became more social and appropriately engaged with others. (*Id.*). Ms. Jones was ordered to abstain from cannabis use and discharged on June 13. (Tr. 1019, 1021; *see also* Tr. 579 (ordered to refrain from THC or cannabis "as this can significantly worsen anxiety, depression, and destabilize mood especially in patients with bipolar disorder")).

Ms. Jones stopped taking her medications as prescribed and used cannabis soon after discharge and quickly became manic again. (Tr. 2114, 2116). Ms. Jones was "released from jail on 7/17/24 after breaking the law in the context of a manic episode due to medication noncompliance." (Tr. 1011). She spoke with Dr. Reyes upon release and explained she was restarted on medication while in jail and she felt the medication was clearing her thoughts. (Tr. 2114). Around that time, Ms. Jones' mother told her case manager that Ms. Jones had not been sleeping and was acting erratic. (Tr. 1011). Ms. Jones' case manager noted Ms. Jones had recently spoken of traveling, which "generally heralds a manic episode." (*Id.*). Due to her erratic behavior and concern for a manic episode, the police transported Ms. Jones to the hospital for a psychiatric evaluation, where she reported not taking lithium as prescribed. (*Id.*). Ms. Jones was irritable and

labile, pacing the emergency department, and trying to evade police, requiring sedation with Ativan, Haldol, and Benadryl. (*Id.*). A drug screen was positive for cannabis. (Tr. 755). Ms. Jones received olanzapine and paliperidone LAI "due to concern for non-adherence to medication regimen in the outpatient setting." (Tr. 1012). She remained agitated for several days following admission, prompting her provider to restart lithium. (*Id.*). Both olanzapine and lithium were increased and, over the course of admission, Ms. Jones' behavior and sleep improved. (Tr. 1013). She was discharged on July 31. (Tr. 1011). She lost her job as a corrections officer due to this episode. (*See* Tr. 2021).

Between August and early October, Ms. Jones reported medication compliance and denied substance use. (Tr. 1838, 1849, 1835, 1833, 1831, 1824, 1817, 1810, 1808, 1802-03, 1799, 1796, 1790). In August, her drug screen was negative. (Tr. 835).

In early October, Ms. Jones met with Nurse Bright and reported trouble sleeping and she stopped taking lithium about a month ago, despite previously reporting compliance. (Tr. 1787). Due to her poor sleep, she agreed to restart lithium that evening. (*Id.*). The following week, Ms. Jones reported taking lithium as prescribed but was still not sleeping well. (Tr. 1777). She continued to take her medications and denied drug use through December 2024. (*See, e.g.*, Tr. 1775, 1773, 1769, 1763-64, 1761, 1754, 1749-51, 1742, 1741, 1728, 1725, 1723, 1721, 1718-19, 1716, 1712, 1710, 1707, 1705) (chronological order). At the end of October, Dr. Reyes prescribed trazadone for insomnia. (Tr. 1767). In November, Ms. Jones reported improved sleep with the additional medication. (Tr. 1756, 1759-60). That month, Ms. Jones' drug screen was negative, and her lithium level was low. (Tr. 1700).

**2025.** In January, Ms. Jones reported she stopped taking olanzapine, trazadone, and lithium "about a month ago because of severe dry mouth." (Tr. 1699). Dr. Reyes noted Ms. Jones was not as engaging, spoke less and in a monotone, provided short responses, and had a blunted affect. (Tr. 1701). She convinced Ms. Jones to stay on her LAI and take lithium. (*Id.*). A few days later, Ms. Jones confirmed she was taking lithium and continued to deny drug use. (Tr. 1692).

Ms. Jones started a full-time factory position in January. (Tr. 1686). In early February, Ms. Jones quit that job. (Tr. 1684). On February 5, Nurse Bright met with Ms. Jones and noted she presented as "a little manic," citing her wide-eyed appearance, rushed speech, odd behaviors (smiling and giggling), flight of ideas, and an unorganized and rushed thought process. (Tr. 1682-83). Ms. Jones denied the use of alcohol and drugs but then stated "I do once in a while." (Tr. 1683). She also endorsed taking her lithium, but Nurse Bright documented that she questioned Ms. Jones' truthfulness based on how she presented. (Tr. 1684). The next day, Ms. Jones' mother called the VA's care coordinator to express concern that Ms. Jones was spending large amounts of money, talking about buying a house, walking around outside at 2:00 or 3:00 in the morning, and not taking her medications. (Tr. 1681).

Ms. Jones was admitted to inpatient psychiatric treatment again on February 7. (Tr. 1005). As with her prior hospitalizations, a drug screen obtained by her psychiatrist was positive for cannabis. (Tr. 1058). Dr. Reyes sent her for a psychiatric assessment due to manic behavior, including buying a luxury vehicle despite not having the means or a driver's license. (Tr. 1005, 1070). There, Ms. Jones reported sleeping three to four hours a night, high energy, and an elevated mood. (*Id.*). She reported taking lithium "sometimes" and denied recent drug and alcohol use. (Tr. 1006). Other progress notes from this admission indicate Ms. Jones admitted to using cannabis

daily for an unspecified time. (Tr. 1675). Blood work showed a non-therapeutic lithium level, consistent with her reported nonadherence. (Tr. 1006). Ms. Jones demonstrated significant improvement over the course of a month once the provider restarted lithium, olanzapine, and paliperidone LAI. (Tr. 1007). Ms. Jones was discharged on March 4. (Tr. 1005, 1008). On discharge, she was instructed to abstain from THC products and marijuana "due to potential for triggering manic episode or psychotic episode." (Tr. 1297; *see also* Tr. 1344 ("Use is very inappropriate and severely detrimental to mental health in the setting of bipolar disorder. Can exacerbate or even trigger manic and psychotic episodes.")).

On March 10, Ms. Jones received her LAI and followed up with Dr. Reyes where she reported medication compliance and denied drug and alcohol use. (Tr. 1273). She reported compliance and sobriety through May, the end of the available medical record. (Tr. 1268, 1266, 1264, 1254, 1250, 1241-43, 1235-36, 1231, 1228, 1224, 1222, 1220, 1214, 1212, 1208, 1202, 1191, 1188, 1186) (chronological order).

**III. Opinion Evidence**

In July 2024, a state agency psychological consultant reviewed a limited set of medical records and determined Ms. Jones' impairments meet the criteria for Listing 12.04(A) and (B) but concluded the medical evidence was insufficient to assess her mental impairments and requested further development on the nature, severity, and duration of her impairments, the associated functional limitations, and the effects of drug addiction and alcohol. (Tr. 68).

To gather evidence of Ms. Jones' functional abilities, the state agency ordered her to attend a consultative mental evaluation. On October 1, 2024, Ms. Jones met with Dr. Herschel Pickholtz for that purpose. (Tr. 781). Based on the clinical interview and observation, Dr. Pickholtz

diagnosed bipolar I disorder, currently in partial remission, and alcohol and cannabis use disorder, both in sustained remission. (Tr. 788). He concluded Ms. Jones' capacities for attention and concentration were in the average range, she is slightly impaired in social interaction, and she is slightly impaired in responding to work pressure "as long as she is receiving her psychiatric medications and counseling." (Tr. 789). Dr. Pickholtz did not provide an opinion on Ms. Jones' abilities when she is not compliant with her medications and counseling.

Later that month, a state agency psychological consultant reviewed the same set of medical records and Dr. Pickholtz's medical opinion. (Tr. 77-79). The consultant found the opinion persuasive, rated mild limitations in all four areas of mental functioning, and concluded Ms. Jones' mental disorders were not severe. (Tr. 79-81). In November, on reconsideration review, another state agency psychological consultant reviewed updated medical records and adopted the prior findings. (Tr. 87).

Notably, the medical records dated between July 2022 and May 2023 were received after the ALJ held the administrative hearing, so none of the medical opinions are based on the full medical history. (Tr. 31). There are also no medical opinions from Ms. Jones' treating providers.

## IV. Testimonial Evidence

At the hearing, Ms. Jones explained she cannot work due to frequent mood swings, memory loss and trouble concentrating, difficulty sleeping, extreme depression and irritability, and mania. (Tr. 55). Ms. Jones lived alone but moved in with her mother and sister when she kept getting into trouble. (Tr. 56). She takes lithium as part of her medication regimen and thinks it causes memory loss. (Tr. 59). When she has manic episodes, she exhibits a total disregard for her safety and others and feels like she is above "the law and God." (Tr. 57-58). She has panic attacks a

couple times a month, usually triggered by crowds or not feeling in control of her situation. (Tr. 58). Ms. Jones also struggles to stay asleep at night, so she naps during the day. (Tr. 59).

## Standard for Disability

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 1382c(a)(3)(A); *see also* 20 C.F.R. § 404.1505(a).

The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine whether a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?
2. Did claimant have a medically determinable impairment, or a combination of impairments, which is "severe," defined as one which substantially limits an individual's ability to perform basic work activities?
3. Does the severe impairment meet one of the listed impairments?
4. What is claimant's residual functional capacity and can claimant perform past relevant work?
5. Can claimant do any other work considering his or her residual functional capacity, age, education, and work experience?

Under this sequential analysis, the claimant has the burden of proof through Step Four. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to prove whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine whether the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do

other work, and meets the duration requirements, is the claimant deemed disabled. 20 C.F.R. § 404.1520(c)-(f); *see also Walters*, 127 F.3d at 529.

### THE ALJ'S DECISION

At Step One, the ALJ determined Ms. Jones had not engaged in substantial gainful activity since the alleged onset date. (Tr. 12). At Step Two, the ALJ identified the following severe impairments: bipolar disorder, post-traumatic stress disorder, and substance use disorders. (Tr. 13). At Step Three, the ALJ found Ms. Jones' impairments did not meet or medically equal the requirements of a listed impairment. (Tr. 13-15). At Step Four, the ALJ determined Ms. Jones' RFC as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: never work in high, exposed places; can never have proximity to moving mechanical parts; can understand, remember, and carry out detailed, but not complex instructions; can perform work without a specific production rate pace, such as an assembly line or hourly production quotas; is limited to occasional interaction with coworkers and the public.

(Tr. 15-16). The ALJ then found Ms. Jones capable of performing her past relevant work as an order picker. (Tr. 24). At Step Five, the ALJ alternatively found Ms. Jones could perform other work, including as a packer, hospital cleaner, and janitor. (Tr. 26). Thus, the ALJ concluded Ms. Jones was not disabled. (Tr. 27).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters,* 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by

substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Apart from considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. *Walters,* 127 F.3d at 528. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not follow its

own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

## Discussion

Ms. Jones raises two alleged errors for review. First, she contends the RFC is not based on "opinion evidence the ALJ could rely on," because the ALJ rejected the state agency consultants' opinions and found Dr. Pickholtz's opinion not fully persuasive. (ECF #6 at PageID 3428, 3430-31). Second, Ms. Jones alleges the ALJ's RFC "does not accurately represent [her] maximum capacity to perform work-related activities," it being "far less restrictive than what the record as a whole demonstrates." (*Id.* at PageID 3422, 3428).

The RFC is an assessment of the most an individual can still do despite her limitations, or more specifically, the extent to which an individual's impairments and related symptoms, including pain, may cause physical or mental limitations or restrictions that affect her capacity to do work-related physical or mental activities. 20 C.F.R. § 404.1545(a)(1); *see also* Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *2 (July 2, 1996). It is "the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis," meaning "8 hours a day, for 5 days a week, or an equivalent work schedule." *Id.*

The assessment is based on all relevant evidence, including but not limited to information about the individual's symptoms, opinions from medical sources about what the individual can still do, effects of treatment, reports of daily activities, and recorded observations. 20 C.F.R. § 404.1545(a)(3); *see also* SSR 96-8p, 1996 WL 374184, at *2, *5.

The Sixth Circuit has rejected the argument that "once the ALJ decided to give no weight to the physicians' opinions regarding his ability to work, the ALJ was required to get the opinion of another physician before setting" the RFC. *Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F.App'x 395, 401 (6th Cir. 2018). In practice, this means the ALJ's RFC need not be consistent with or based on a medical opinion. Thus, Ms. Jones' argument the RFC was not based on opinion evidence does not show an error by the ALJ.

In her second alleged error, Ms. Jones contends the ALJ's RFC "does not accurately represent [her] maximum capacity to perform work-related activities," it being "far less restrictive than what the record as a whole demonstrates." (ECF #6 at PageID 3422, 3428). According to Ms. Jones, her bipolar disorder does not affect her ability to function all the time, so she can work "at least for a period of time," but she "will undoubtedly fall into a manic episode eventually," during which she cannot care for herself. (*Id.* at PageID 3429).

Evaluating a mental disorder involving exacerbations and remissions, such as bipolar disorder, requires consideration of how often exacerbations occur, how long they last, what causes the disorder to worsen or improve, and any other relevant information. 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00F(4)(a). The regulations recognize that a claimant with a mental disorder involving exacerbations may be able to use the four areas of mental functioning to work for a few

weeks or months, but that recurrence or worsening of symptoms "can interfere enough to render [a claimant] unable to sustain the work." *Id.* at § 12.00F(4)(b).

The record shows Ms. Jones has bipolar disorder with manic episodes for which she has been hospitalized on 15 separate occasions, with 12 admissions between July 2021 and November 2022, and 3 admissions between June 2024 and March 2025. Between admissions, her VA care team maintained close contact with Ms. Jones, monitoring her mental health, medication compliance, behaviors in the community, and drug use, with the intent of helping Ms. Jones avoid further inpatient hospitalizations. The ALJ clearly acknowledged that Ms. Jones' mental disorder involves exacerbations but appears to have attributed those exacerbations to her nonadherence to medications and cannabis use. He noted more than once that Ms. Jones required involuntarily hospitalization "somewhat frequent[ly]," but "these episodes have consistently occurred only during periods of medication noncompliance and substance use." (Tr. 15; *see also* Tr. 13, 22-23).

And therein lies the ALJ's error. Under the regulations, a claimant's failure to follow prescribed treatment that might improve symptoms is a proper and indeed necessary consideration in evaluating disability. *See* SSR 16-3p, 2017 WL 5180304, at *9 (Oct. 25, 2017). If a claimant does not follow treatment, the adjudicator "may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record." *Id.* But before finding a claimant's alleged symptoms inconsistent with the evidence, the ALJ must consider possible reasons why the claimant may not comply with treatment and explain how he considered the claimant's reasons in the decision. *Id.* at *9-10; *see also Dooley v. Comm'r of Soc. Sec.*, 656 F.App'x 113, 119 (6th Cir. 2016). Social security guidance highlights some possible reasons a claimant may not follow treatment, including intolerable side effects and that an individual with a mental

impairment that affects judgment may not be aware that she has a disorder requiring treatment. SSR 16-3p, 2017 WL 5180304, at *10. Additionally, the Sixth Circuit has long recognized, "[f]or some mental disorders, the very failure to seek treatment is simply another symptom of the disorder itself." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283 (6th Cir. 2009) (citing *Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009) (collecting cases recognizing that a mentally ill person's noncompliance with treatment "can be . . . the result of the mental impairment itself and, therefore, neither willful nor without a justifiable excuse")); *Kestel v. Comm'r of Soc. Sec.*, 756 F.App'x 593, 599 (6th Cir. 2018) (same); *see also Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989) ("Appellant may have failed to seek psychiatric treatment for his mental condition, but it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation."). But those cases do not establish a per se rule that the existence of a mental impairment constitutes an acceptable reason for failure to follow prescribed treatment. Instead, the claimant must present evidence linking the mental illness to medication noncompliance, preferably in a medical opinion or assessment by a medical source. *Burge v. Comm'r of Soc. Sec.*, No. 1:13-cv-87, 2013 WL 6837192, at *3 (N.D. Ohio Dec. 26, 2013); *see also Rogers v. Comm'r of Soc. Sec.*, No. 17-14151, 2019 WL 1102226, at *3 (E.D. Mich. Jan. 17, 2019), *report and recommendation adopted,* 2019 WL 1099019 (E.D. Mich. Mar. 8, 2019). If the claimant presents such evidence, the ALJ is not bound to find the claimant disabled, but the ALJ must consider the claimant's reasons and explain how that evidence factored into his decision. SSR 16-3p, 2017 WL 5180304, at *9-10.

Here, the ALJ acknowledged Ms. Jones' testimony at the hearing that she thinks lithium causes memory loss but did not explain how that reason entered his decision. But more than that,

the ALJ made no mention of the frequent statements Ms. Jones made to her providers about the side effects of her medications. Described above, Ms. Jones reported not taking her medications or taking them inconsistently, namely quetiapine, lithium, olanzapine, and paliperidone LAI, because they made her tired during the day and more depressed. (*See, e.g.*, Tr. 405, 427, 428, 2505, 2581, 2612, 2618, 2800, 3090, 3263, 3358). These medications are known to cause drowsiness.[1] In addition, the record shows multiple instances where Ms. Jones denied having bipolar disorder or the need for medication. (*See, e.g.*, Tr. 355, 2050, 2187, 2411, 3090). And the medical record is replete with medical assessments linking Ms. Jones' manic episodes of bipolar disorder to noncompliance with treatment. (*See, e.g.*, Tr. 655 ("Given history of medication non-adherence, would likely benefit from a psychotropic medication that can be converted to an LAI."); Tr. 1032 ("she has had several hospitalizations in the past two years, all related to medication nonadherence and mania"); Tr. 1373 ("Patient continues to lack insight regarding the severity of her symptoms when she is not doing well, as well as cannabis's contribution to destabilization"); Tr. 2509 ("The veteran has a history of stopping her meds when she starts feeling better"); Tr. 3091 ("has bipolar disorder with history of multiple psychiatric hospitalizations due to mania and [treatment] noncompliance")).

[1] *Quetiapine, MedlinePlus*, http://medlineplus.gov/druginfo/meds/a698019.html (last accessed Nov. 12, 2026) ("you should know that quetiapine may make you drowsy"); *Lithium, MedlinePlus*, http://medlineplus.gov/druginfo/meds/a681039.html (last accessed Nov. 12, 2026) (same); *Olanzapine, MedlinePlus*, http://medlineplus.gov/druginfo/meds/a601213.html (last accessed Nov. 12, 2026) (same); *Paliperidone Injection, MedlinePlus*, http://medlineplus.gov/druginfo/meds/a615032.html (last accessed Nov. 12, 2026) ("you should know that receiving paliperidone extended-release injection may make you drowsy and may affect your ability to think clearly, make decisions, and react quickly").

Ms. Jones thus met her burden to present evidence that her noncompliance with treatment stemmed from her bipolar disorder. The ALJ erred in construing Ms. Jones' noncompliance as evidence that she is not disabled by her condition without considering evidence that the side effects of her medications were intolerable or that her nonadherence to medication was a symptom of her bipolar disorder, necessitating remand. *See Christine Marie G. v. Comm'r of Sec. Sec.*, No. 22-11983, 2023 WL 9744178, at *4 (E.D. Mich. Sept. 29, 2023); *Hardy v. Comm'r of Soc. Sec.*, No. 3:19-cv-382, 2021 WL 4399752, at *5 (S.D. Ohio Sept. 27, 2021); *Rogers*, 2019 WL 1102226, at *3. This error requires remand for further proceedings.

## CONCLUSION AND RECOMMENDATION

After reviewing the record, the parties' arguments, and the law, I recommend the District Court **REVERSE** the Commissioner's decision denying disability insurance benefits and **REMAND** for additional proceedings not inconsistent with this Report and Recommendation.

Dated: November 12, 2026



DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

## OBJECTIONS, REVIEW, AND APPEAL

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.**

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health & Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-cv-186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).